**Jerry Allen MARK, Applicant–Appellant,**

v.

**STATE of Iowa, Respondent–Appellee.**

No. 95–0818.

Court of Appeals of Iowa.

April 30, 1997.

Philip B. Mears of the Mears Law Office, Iowa City, for applicant-appellant.

Thomas J. Miller, Attorney General, Thomas S. Tauber, Assistant Attorney General, Thomas J. Ferguson, County Attorney, and D. Raymond Walton, Assistant County Attorney, for respondent-appellee.

Considered by CADY, P.J., and HUITINK, J., and SCHLEGEL, Senior Judge.*

HUITINK, Judge.

Defendant Jerry Mark appeals the district court's denial of his application for postconviction relief challenging his conviction for first-degree murder. His petition alleged he was denied a fair trial by the State's suppression of several items of exculpatory evidence. Mark also appeals the district court's refusal to allow time for further testing of the bullets found at the crime scene.

Following a jury trial, Mark was convicted of four counts of first-degree murder in June 1976 for the shooting deaths of his brother Leslie, his brother's wife Jorjean, and their

---

* Senior judge from the Iowa Court of Appeals serving on this court by order of the Iowa Su- preme Court.

two children, five-year-old Julie and eighteen-month-old Jeffrey. The trial record indicates Leslie Mark and his family died between 1:00 a.m. and 3:00 a.m. on November 1, 1975.

At the time of the murders, Mark's residence was in California where he had moved in 1974. In September 1975, Leslie Mark and his family moved into the home of the brothers' parents and took over operation of their farm. The State's theory was that Mark committed the murders because he resented the arrangements between Leslie and his parents.

Mark's conviction was based largely on circumstantial evidence indicating he carefully planned and made a clandestine trip to Iowa on his motorcycle to murder his brother's family. The trial record indicates that on October 29, 1975, Mark left Berkeley, California, on his Honda 450 motorcycle. There is evidence he made calls to his Berkeley residence from Nevada and Wyoming and was observed at different locations in Nebraska and Iowa.

Following the murders, Mark was seen on November 1 in Williams, Iowa at approximately 5:00 a.m., and then in Stuart, Iowa at approximately 7:30 a.m. He arrived at the home of friends in South Lake Tahoe, California on the evening of November 2. Mark was arrested and charged with the murders on November 10, 1975.

Mark's conviction was affirmed on direct appeal by the supreme court. *State v. Mark,* 286 N.W.2d 396 (Iowa 1979). The supreme court rejected Mark's claim that his due process rights were violated when he was denied access to the state's investigative files. The court stated:

> In reviewing the ruling on defendant's first motion or request to inspect all the police files on the case, we are mindful of what we said in *State v. Hall,* 249 N.W.2d 843, 846 (Iowa 1977): '[I]t is clear from both federal and Iowa decisions not all information in the prosecution's files must be turned over as a matter of constitutional due process.' We also there said: '[T]he rule against defense access to all information in the prosecutor's file and dragnet requests for information has been stead-

fastly maintained.' We reaffirm that position here.

> Defendant's first motion to produce, which was of the dragnet type, was properly overruled.

*Id.* at 402. The court also held that Mark waived any error relative to his amended motion to produce by not properly developing the record. *Id.* at 403.

These proceedings were initiated June 30, 1987, the last day of the three-year period of limitation that became effective July 1, 1984. After many delays granted at Mark's request, this matter was tried in 1994. During the seven-year interval, Mark and his counsel reviewed essentially all of the State's investigative files, deposed investigators and witnesses, and obtained DNA testing of crime scene evidence.

## I. Disclosure of Exculpatory Evidence.

On appeal, Mark alleges the State failed to disclose several exculpatory items. We will address each of these separately.

A defendant's due process rights are violated when the prosecution fails to produce upon request evidence favorable to the accused "where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215, 218 (1963); *see also State v. Romeo,* 542 N.W.2d 543, 551 (Iowa 1996).

To establish a *Brady* violation, Mark must prove (1) the prosecution suppressed evidence, (2) the evidence was favorable to his defense, and (3) the evidence was material to the issue of guilt. *See Cornell v. State,* 430 N.W.2d 384, 385 (Iowa 1988). Because Mark's contentions implicate his constitutional rights, we review the record de novo examining the totality of the circumstances. *Conner v. State,* 362 N.W.2d 449, 458 (Iowa 1985).

Mark has the burden to establish the materiality of the suppressed evidence. *State v. Anderson,* 410 N.W.2d 231, 234 (Iowa 1987). "[T]he evidence is material only if there is a reasonable probability that

had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* Upon review of the postconviction court's ruling, we must consider any adverse effects that the failure to disclose might have had on the preparation or presentation of the defendant's case. *Anderson* at 234–35.

 The *Brady* rule applies when the evidence is discovered after trial "which had been known to the prosecution but unknown to the defense." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342, 349 (1976). Exculpatory evidence is not "suppressed" if the defendant knew or should have known of the essential facts permitting him to take advantage of the evidence. *Cornell,* 430 N.W.2d at 385 (citing *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir.1982)).

### A. Alibi Witness Jean Doyle.

 Mark contends the State suppressed reports of interviews with a witness, Jean Doyle, who made a tentative identification placing Mark at a truck stop in North Platte, Nebraska, on Saturday, November 1. The record indicates Special Agent Earnest Baty, Jr., did a time and distance study in connection with the case in March 1976. Leaving the Leslie Mark farm at 3:48 a.m., he arrived in North Platte at 3:14 p.m. Doyle testified at the postconviction trial that she now believes she saw Mark between 9:00 and 10:00 a.m. rather than at noon as she originally testified. Mark contends that both Doyle's initial statements and her recent testimony are inconsistent with guilt because the murders occurred between 1:00 and 3:00 a.m.

Mark's contention regarding this witness fails because he has not met his burden to show the State suppressed this evidence. The record indicates Mark was told by investigators that they located a waitress in North Platte who claimed she saw him there at noon on November 1. Additionally, agent Ron Forest told Mark's attorney about Doyle's stated observations during an April 1976 deposition. Accordingly, Mark and his attorney knew or should have known essential facts permitting them to take advantage of potential alibi evidence.

### B. Cigarette Butt Evidence.

 At trial the State offered several Marlboro cigarette butts found at the Leslie Mark residence after the murders. One butt was found in Julie Mark's bedroom, one in another upstairs room, and two more in the basement where the electricity had been disconnected by the family's assailant. Mark claims the State suppressed results of blood testing of saliva found on the cigarette butts, the fact that the integrity of the crime scene was compromised, and the possibility that the cigarette butt in Julie Mark's room was not a Marlboro.

Criminalist Robert Harvey testified that tests indicated all four cigarettes were smoked by a person with type-O blood. Mark's blood was type-O and he also smoked Marlboro cigarettes. However, before trial it was discovered that the cigarette in the upstairs room was smoked by Deputy James Weiser whose blood type was type-A. In a March 1976 memorandum, prosecutor Harry W. Zanville acknowledged that Harvey informed him it was "not uncommon for a small saliva sample taken from a type-A secretor to have a type-O test result." Harvey's postconviction testimony confirms this assertion. This document and other reports concerning the cigarette butts were not produced by the State.

Mark argues the reports could have changed the outcome of his trial because the cigarette butts represent the only evidence placing him inside the Leslie Mark home. We reject this argument because Mark knew prior to trial that Deputy Weiser had smoked in the upstairs room and the integrity of the crime scene was compromised. Additionally, Mark was alerted to potential blood test errors during Harvey's pretrial deposition. The record also reveals Harvey was vigorously cross-examined by the defense on the blood-typing issue. Therefore, the information in the Zanville memorandum was cumulative of other testimony informing the jury that the cigarette butt evidence had question-

able probative value.[1] Finally, we note that the cigarette butt found in Julie Mark's bedroom was available for inspection by the defense, thus Mark was aware that it had been smoked down to the filter and may not have been a Marlboro. Mark has not shown a reasonable probability that the outcome of the trial would have been different had any of these reports been disclosed.

### C. Alibi Witness Leslie Warren.

■ Both the defense and the State agreed at trial that Leslie Warren, a maintenance employee at an eastbound rest area in Chappell, Nebraska, saw Mark at the rest area. However, the parties dispute whether Warren saw Mark on October 31 or on November 1. The murders took place on November 1 between 1:00 and 3:00 a.m. If Mark was seen in Chappell on the morning of Friday, October 31, he could have traveled further east and arrived at the Leslie Mark farm by the time of the murders. Thus, this fact would be consistent with guilt. If Warren saw Mark the morning of November 1, this information would have established an alibi for Mark given the time of the murders and the distance, approximately 684 miles, between the Leslie Mark farm and Chappell.

Warren testified he did not work on Saturday morning from 9:00 a.m. until noon because he had an appointment with Dr. Calvin Cutright in Sidney, Nebraska. However, Mark asserts postconviction discovery uncovered medical records from Dr. Cutright with a stamp date noting Warren's appointment

was October 31, rather than November 1. Mark argues there is a reasonable probability that had the information been disclosed, the result of the trial would have been different. Mark also claims the State failed to obtain work-related documents and Warren's diary establishing the date of Warren's appointment even though the State knew of their existence.

The postconviction depositions of Mark's trial counsel reveal that the defense received something from "the government" that "proved to [their] satisfaction" that Warren's version of the events "hurt us."[2] We, like the postconviction court, find the defense knew or should have known about the existence of the medical report. There is no indication that the defense could not have obtained this information from Dr. Cutright's office. Furthermore, we reject Mark's suggestion the State failed to secure certain documents that may have shown Warren saw Dr. Cutright on October 31. The weight of the evidence indicates the work records support the State's position that the appointment actually took place on Saturday, November 1, despite the date noted in the medical record. We conclude these materials would not have had an impact on the outcome of the trial.

### D. Other Identification Witnesses.

■ Mark argues the State suppressed information relating to several identification witnesses who testified at trial. First, Mark

---

1. The admissibility of the cigarette butt evidence was challenged by Mark on direct appeal to the Iowa Supreme Court where Mark argued that the probative value of the blood type comparison evidence was outweighed by its prejudicial effect. *See State v. Mark*, 286 N.W.2d at 413. The court provided the following reasoning before finding no abuse of discretion by the trial court in admitting the evidence:

 The State admits that blood grouping tests are subject to the possibility of error. This possibility was explained to the jury by the State criminalist and was illustrated by the test results of Deputy Weiser's cigarette butt.
 The fact that the test was subject to the possibility of error, which was fully explained to the jury, only goes to the weight to be given the evidence by the jury. It does not affect admissibility. *See United States v. Garguilo*, 554 F.2d 59, 64 (2nd Cir.1977) (possibility of error in expert testimony only goes to weight); *see also*

*Castleberry v. State*, 522 P.2d 257, 272–73 (Okl. Crim.1974); *cf. Shanks v. State*, 185 Md. [437] at 448, 45 A.2d [85] at 88–89 [(1945)].
 *Id.*

2. We reject Mark's argument that the postconviction court improperly considered the deposition testimony of his trial counsel. Trial counsel was cross-examined at the postconviction proceeding about inconsistencies in his deposition testimony. Therefore, the deposition testimony was not hearsay. *See* Iowa R. Evid. 801(d)(1). Furthermore, trial counsel's testimony was substantially similar to his deposition testimony, that is, that the defense came across information convincing them that Warren was in fact at the doctor on November 1. Accordingly, the deposition testimony was merely cumulative of trial counsel's postconviction testimony.

argues the State did not disclose police reports summarizing an interview with Donald Shearer, who placed Mark 569 miles west of the crime scene at a Stuckey's in Brady, Nebraska, at noon on October 31. He contends these reports refer to a gas station attendant, Larry Holmes, who denied seeing the man described by Shearer. He also contends Shearer did not initially mention he saw an Iowa license plate on the motorcycle or that the rider had red hair. Mark argues this information would have been helpful to the defense.

The defense learned of Holmes' identity during Shearer's pretrial deposition. Mark also has not shown a reasonable probability the omissions in Shearer's initial statements to police would have affected the outcome of the trial.

Mark next asserts undisclosed police reports would have enabled the defense to discredit the testimony of Karelyn Kemp and Mary Stinson, two employees at the Shamrock Cafe in Atlantic, Iowa, who testified they saw Mark in the cafe around 6:00 p.m. on October 31. The reports refer to a trucker, James Prosser, who was present in the cafe at the same time and denied Mark was there. Another report reveals Stinson, contrary to her trial testimony, told police the rider she saw was in the cafe between 7:00 and 8:00 p.m. and he wore a red helmet.

We conclude defense counsel knew or should have known of the substance of this evidence. Stinson told Mark's trial counsel at her deposition about two truckers in the cafe at the same time Mark was present. Furthermore, Mark has not shown the discrepancies in Stinson's initial identification would have changed the verdict.

Mark also claims the State withheld reports invalidating the identification testimony of Barbara Smith who saw Mark in Newton, Iowa between 6:30 and 7:30 p.m. on October 31. Her initial statements to police indicated the motorcyclist had ear-length dishwater blond hair. Mark has red hair and had been described by other eyewitnesses as clean-cut. Smith's line-up identification of Mark revealed that Mark did not look like the person who came into Stuckey's restaurant on October 31.

The imprecision of Smith's identification was revealed during her deposition and referred to at trial. Mark was aware Smith believed the motorcyclist had dishwater blond unkempt hair. Mark has failed to demonstrate the State suppressed this evidence or that the police report would have changed the verdict.

Mark also argues the State suppressed reports tending to discount the identification testimony of Delbert Van Hauen, who claimed Mark was at the Holiday service station in Ackley, Iowa, on Friday, October 31. Some of the details provided by Van Hauen and another service station employee are contrary to the descriptions given by other eyewitnesses and are also contrary to the actual description of Mark's motorcycle and his attire.

The record indicates Van Hauen's identification was addressed in Van Hauen's deposition and also at trial. Mark was on notice of the other employee's presence and also the inconsistencies between Van Hauen's description and the other eyewitness descriptions of Mark's motorcycle and his clothing. Accordingly, this evidence was not suppressed nor would it have influenced the verdict.

Mark contends the State withheld police reports detailing inconsistencies in the identification made by Jayathan Hurd at the Boondocks station in Williams, Iowa, and also revealing the existence of other witnesses in the cafe who did not recall seeing Mark. At trial Hurd testified he saw Mark between 3:30 and 5:00 a.m. on November 1. However, another employee informed police that Hurd told him he observed Mark between 2:30 and 4:30 a.m. Hurd indicated in his deposition that other employees were present in the cafe at the time he saw Mark. Mark had sufficient facts necessary to pursue the matter. This evidence was therefore not suppressed because Mark knew or should have known these essential facts.

Finally, Mark asserts the State withheld police reports revealing discrepancies in the identification made by Rosalie McGinnis. McGinnis testified at trial that between 7:00 and 8:00 a.m. on November 1, Mark came

into the Conoco gas station in Stuart, Iowa, approximately 202 miles from the murder scene. The police reports indicate McGinnis believed her memory was impaired by a brain tumor. She also stated the motorcyclist purchased groceries with a credit card. Postconviction discovery disclosed the credit card belonged to a man from St. Charles, Iowa.

These discrepancies were addressed at trial. Furthermore, we find the impeachment value of both McGinnis' impaired memory and the credit card purchase was minimal and therefore would not have influenced the verdict.

We have reviewed all of Mark's arguments challenging the State's suppression of reports relating to the identification witnesses and conclude he has failed to satisfy the *Brady* elements on each claim. We affirm on this issue.

### E. Shoe Print Evidence.

■ Mark claims the State withheld police reports indicating the prints found at the crime scene "showed slight deformity to outside rear edge of both heels." He also asserts the State failed to disclose a report indicating a pair of shoes fitting Mark properly had a sole one-half inch longer than the crime scene prints. The record indicates the matter of the shoe print "deformity" as well as the shoe with the longer sole were known and addressed at trial. This evidence was therefore not suppressed.

■ Mark contends other reports were suppressed that indicated several models of tennis shoes could have matched the crime scene prints. We note that these reports did not demonstrate Mark was incapable of making the prints, rather only establish several sizes and brands of shoes could have made the prints. Accordingly, the information would not have had an impact on the trial, especially in light of the other characteristics of the prints that tend to identify Mark as the person who made them.

### F. Availability of Ammunition.

■ The State argued at trial that Mark purchased a rare type of ammunition from Ken's Sport Shop in Paso Robles, California, matching the two shells found across the road from the Leslie Mark home where the assailant had cut the phone lines. Mark claims an undisclosed police report reveals a partial box of .38 Long Colt ammunition was obtained from Olson's Boathouse in Waterloo within a week of the crime. Although Mark knew about the box, he claims he was not informed there were thirteen bullets missing from the box of fifty. Mark contends there may have been thirteen bullets fired in the Leslie Mark home. The reports also indicate a resident of Waverly purchased a box of the ammunition from Olson's in August 1975 and that similar boxes of ammunition were available at Chuck's Sport Shop in Williamsburg.

Mark's trial counsel testified at the postconviction hearing that the defense was aware of the existence of the box of Long Colt bullets and of the "extensive checks" for availability and sales of the bullets in the "surrounding area." Furthermore, trial counsel admitted examining a partial box of bullets although he was unsure whether it was the partial box from Olson's. Based on this testimony, we conclude Mark knew or at least could have determined how many bullets were missing from the box and also that other boxes of this ammunition may have been available locally. In any event, Mark's counsel agreed the partial box found at Olson's was not exculpatory because evidence of sixteen bullets, not thirteen, were found at the crime scene. There is no reasonable probability the existence of the partial box would have influenced the verdict.

### II. Further Testing of the Crime Scene Bullets.

■ Mark's final issue concerns the postconviction court's refusal to allow more testing of the crime scene bullets. Neutron Activation Analysis (NAA) tests conducted in 1976 revealed similarities between the bullets purchased by Mark in California and the bullets found at the crime scene. An FBI agent testified one similarity between the samples was that neither sample contained any arsenic.

The postconviction court ordered the bullets taken from the former Olson's Boat-

House be tested and compared to the crime scene bullets. The court also appointed an expert, Dr. Vincent Guinn, to assist Mark. These tests revealed arsenic in both the crime scene samples and the samples from Ken's Sport Shop. Mark claims this disclosure justifies the postconviction relief requested.

The fact that both samples contained arsenic does not indicate the crime scene bullets and the Ken's Sport Shop bullets are in fact dissimilar but rather merely impeaches one aspect of the State's trial evidence. This circumstance is not sufficient to create a reasonable probability of a different result.

We treat Mark's request for further testing of the bullets as a motion for a continuance. We hold the trial court did not abuse its discretion by refusing to allow more time for further testing and comparison of the different bullet samples. *See State v. Ware,* 338 N.W.2d 707 (Iowa 1983) (trial court is accorded broad discretion in ruling on motions for continuance). The court ordered the State to release the physical evidence to Mark and the court appointed an expert to assist Mark. The State complied and Mark was provided with an opportunity to test both samples of bullets. Mark has not identified anything in the record to suggest further testing would add to what has already been determined by previous testing and comparisons. Moreover, further testing of the Olson's BoatHouse bullets would not provide any useful information that could have affected the verdict. Accordingly, we affirm the district court's denial of his request for further testing.

We affirm the district court's denial of Mark's petition for postconviction relief in its entirety.

**AFFIRMED.**