# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 06-3476/3513

_____

Jerry Mark,                                        \*
                                                   \*
     Appellee/Cross-Appellant,           \*
                                                   \*
     v.                                  \*
                                                   \*  Appeal from the United States
John Ault,                                         \*  District Court for the
                                                   \*  Northern District of Iowa.
     Appellant/Cross-Appellee,           \*
                                                   \*
Warden Herb Maschner; Warden                       \*
Ken Burger,                                        \*
                                                   \*
     Defendants.                         \*


_____

Submitted: June 11, 2007
       Filed: August 16, 2007 (Corrected: 08/23/2007)
       (Corrected: 09/18/2007)

_____

Before MELLOY, SMITH and GRUENDER, Circuit Judges.

_____


GRUENDER, Circuit Judge.

    An Iowa jury convicted Jerry Mark ("Mark") on four counts of first-degree murder in 1976. Following unsuccessful state appeals and postconviction proceedings, Mark filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. After denying Mark's motion to expand the record, the district court granted

his petition for writ of habeas corpus. Warden John Ault appeals the district court's grant of Mark's petition, and Mark cross-appeals its denial of his motion to expand the record. For the reasons that follow, we affirm the district court's denial of Mark's motion to expand the record and reverse its grant of his petition for writ of habeas corpus.

## I.    BACKGROUND

On November 1, 1975, between 1:00 a.m. and 3:00 a.m., four persons were shot to death in their home at the Leslie Mark farm in Black Hawk County, Iowa. The four victims, all of whom were related to Mark, were Leslie Mark, Mark's brother, Leslie's wife Jorjean, their five-year-old daughter Julie and eighteen-month-old son Jeffery. Mark was charged with four counts of first-degree murder and tried in Iowa District Court for Woodbury County. After a jury trial in which Mark did not testify, he was convicted on all four counts and subsequently received a sentence of life imprisonment.

On direct appeal, the Iowa Supreme Court concluded that the jury could have determined that the following events occurred:

> On October 3, 1975, [Mark] purchased a white helmet and a used 450cc Honda motorcycle somewhere near his residence in Berkeley, California. The motorcycle was dark brown in color, had a windshield and leg protectors and a luggage box on the back.
>
> [Mark] also owned an Iowa registered 100cc Honda motorcycle. At sometime prior to November 1, 1975, he removed the Iowa license plate from his 100cc Honda and put the plate on the 450cc Honda.
>
> On October 20 [Mark] purchased one box of fifty .38 caliber Winchester Western Long Colt bullets manufactured in 1975, using his

-2-

Iowa driver's license for identification, from Ken's Sport Shop in Paso Robles, California. He had access to a pistol capable of firing these bullets.

On October 28 [Mark] bought a black Belstaff riding suit and a pair of motorcycle gloves from a Honda dealership in Berkeley, California.

Jerry Mark left his apartment in Berkeley on the morning of October 29 on his 450cc motorcycle. He traveled through Lovelock, Nevada, on Interstate 80. He proceeded on Interstate 80 through Cheyenne, Wyoming, to Chappell, Nebraska, arriving there on the morning of October 31. [Mark] continued east toward Iowa stopping at a Stuckeys Pecan Shoppe in Brady, Nebraska. He left Brady and traveled to Atlantic, Iowa, stopping at the Shamrock Cafe. Mark then proceeded to Newton, where he was observed at another Stuckeys Pecan Shoppe. After leaving Newton, [Mark] traveled north to Ackley, stopping at a Holiday gas station at approximately 8:00 p.m. on October 31. Ackley is only 36 miles from the Leslie Mark farm, which is located just west of Cedar Falls, Iowa, on Union Road.

Jerry Mark left Ackley after getting gas and later was at the Leslie Mark farm in the early morning hours of November 1. He cut the wires in the telephone terminal box located across the road from the Leslie Mark farmhouse. In the process he dropped two .38 caliber Long Colt bullets on the ground. He then walked up the driveway to the Mark residence. He walked past the house to a camper, in which Leslie occasionally slept after unloading corn into his storage bin. He returned to the house and using the key that normally hung by the back door, entered the house. At sometime he went to the basement, turned off the power and while there smoked two Marlboro cigarettes.

Jerry Mark proceeded to Leslie's and Jorjean's bedroom, located on the main floor of the house. He shot each of them, Leslie five times, four times in the head and once in the stomach, and Jorjean four times, twice in the head and once in the back, with another shot simply grazing her skin. The wounds were fatal to each.

-3-

[Mark] also made his way upstairs to Julie Mark's bedroom. He fatally shot Julie twice, once through the heart and once through her right eye. While in her room, he smoked another Marlboro cigarette.

[Mark] also went to Jeffery Mark's bedroom and shot the infant two times, once in the left chest and once above the right eye, killing him.

Jerry Mark left the farm and was next observed in Williams, Iowa, sixty-six miles west of the Mark farmhouse, at approximately 5:00 a.m. on November 1. At 7:30 a.m. he was seen in Stuart, Iowa, and between 3:00 and 4:00 p.m. he called his residence in California from Alda, Nebraska.

*State v. Mark*, 286 N.W.2d 396, 401 (Iowa 1979).[1] On direct appeal, Mark claimed that the State suppressed numerous pieces of material exculpatory evidence in violation of his due process rights. *See Brady v. Maryland*, 373 U.S. 83 (1963). The Iowa Supreme Court affirmed Mark's conviction and sentence. *Mark*, 286 N.W.2d at 414.

Receiving no relief on direct appeal, Mark filed a petition for postconviction relief ("PCR") in the Iowa District Court for Black Hawk County based on his claim that the State suppressed material exculpatory evidence in violation of his due process rights. The district court denied Mark's PCR petition, holding that "[a]fter considering the many claims that exculpatory evidence was wrongly withheld, both individually and collectively, this court is satisfied that there is no reasonable probability that the results of the trial would have been different had the material been disclosed." *Mark v. State*, No. PCCV069121, slip op. at 50 (Iowa D. Ct. Black Hawk County, Feb. 3, 1995).

---

[1]These facts were adopted by the Black Hawk County District Court in Mark's state postconviction proceedings, by the federal district court in these proceedings and by Mark in his brief to this court.

-4-

On appeal of the denial of Mark's PCR petition, the Iowa Court of Appeals addressed in detail each of Mark's *Brady* claims, which it arranged into six categories. The first category of evidence related to witness Jean Doyle. Doyle, who did not testify at Mark's trial, had made a tentative identification placing Mark at a truck stop in North Platte, Nebraska, at noon on Saturday, November 1. Mark claimed that this statement was not disclosed and was material because it is inconsistent with his guilt. Specifically, since it had been established at trial that it would take a person approximately eleven-and-a-half hours to drive from the Leslie Mark farm to North Platte and because the murders occurred between 1:00 a.m. and 3:00 a.m., the murderer could not have been at the truck stop in North Platte until between 12:30 p.m. and 2:30 p.m. According to Mark, since Doyle saw him at noon, the evidence tended to show that he was not the murderer. The Iowa Court of Appeals held that this evidence was not suppressed because investigators had informed Mark during his interrogation that there was a "lady in North Platte" who could identify him and one of the investigating agents testified in his deposition about the details of Doyle's statements. Thus, Mark "knew or should have known" of this evidence. *Mark v. State*, 568 N.W.2d 820, 823 (Iowa Ct. App. 1997).

The second category of evidence analyzed by the Iowa Court of Appeals concerned four cigarette butts that were found at the crime scene. Mark claimed the State suppressed results of blood testing conducted on saliva from the cigarette butts and the possibility that the cigarette butt in Julie Mark's room was not a Marlboro brand cigarette. The Iowa Court of Appeals summarized the blood-test evidence as follows:

> Criminalist Robert Harvey testified [at trial] that tests indicated all four cigarettes [found at the crime scene] were smoked by a person with type-O blood. Mark's blood was type-O and he also smoked Marlboro cigarettes. However, before trial it was discovered that the cigarette in the upstairs room was smoked by Deputy James Weiser whose blood type was type-A. In a March 1976 memorandum, prosecutor Harry W.

> Zanville acknowledged that Harvey informed him it was "not uncommon for a small saliva sample taken from a type-A secretor to have a type-O test result." Harvey's postconviction testimony confirms this assertion. This document and other reports concerning the cigarette butts were not produced by the State.

*Id.* The Iowa Court of Appeals held that this evidence was not material and would not have affected the outcome of the trial because it was "cumulative of other testimony informing the jury that the cigarette butt evidence had questionable probative value." *Id.* at 823-24. As for the cigarette butt found in Julie Mark's room, the Iowa Court of Appeals held that because it "was available for inspection by the defense" prior to trial, "Mark was aware that it had been smoked down to the filter and may not have been a Marlboro." *Id.* at 824. The court also held that "Mark has not shown a reasonable probability that the outcome of the trial would have been different had any of these reports been disclosed." *Id.*

The third category of evidence concerned witness Leslie Warren. The Iowa Court of Appeals explained the significance of the Warren evidence as follows:

> Both the defense and the State agreed at trial that Leslie Warren, a maintenance employee at an eastbound rest area in Chappell, Nebraska, saw Mark at the rest area. However, the parties dispute whether Warren saw Mark on October 31 or on November 1. The murders took place on November 1 between 1:00 and 3:00 a.m. If Mark was seen in Chappell on the morning of Friday, October 31, he could have traveled further east and arrived at the Leslie Mark farm by the time of the murders. Thus, this fact would be consistent with guilt. If Warren saw Mark the morning of November 1, this information would have established an alibi for Mark given the time of the murders and the distance, approximately 684 miles, between the Leslie Mark farm and Chappell.

*Id.* at 824. At Mark's trial, Warren testified that he knew he had seen Mark on Friday, October 31, as opposed to Saturday, November 1, because he had a doctor's appointment on November 1 and was therefore not at work on that morning. Mark

claimed that the State suppressed medical records from Warren's doctor that were stamped with the date of October 31, indicating that Warren was not at the doctor and was instead at work on November 1. Mark argued there is a reasonable probability that had the information been disclosed, the result of the trial would have been different. Mark also claimed the State failed to obtain Warren's work-related documents and his diary establishing the date of Warren's appointment even though the State knew of their existence. The Iowa Court of Appeals rejected these arguments, holding that "the defense knew or should have known about the existence of the medical report. There is no indication that the defense could not have obtained this information from [the doctor's] office." *Id.* Noting that the weight of the work-record evidence supported the State's theory that Warren visited the doctor on Saturday, November 1, the court concluded that the evidence "would not have had an impact on the outcome of the trial." *Id.*

Mark also claimed that the State suppressed a fourth category of material evidence relating to shoe prints found at the crime scene. At trial, Officer Robert Anton testified that the shoe prints found at the crime scene indicated that the murderer had a shoe length of twelve inches. He also told the jury that the pattern of the sole from the shoe prints indicated that the type of shoe worn by the murderer was the Converse brand shoe called "Indy 500." Officer Anton measured a pair of size eleven Converse Indy 500 shoe; one shoe was eleven and seven-eighths inches long and the other was twelve inches long. He also stated that of a pair of size eleven-and-a-half Converse Indy 500 shoes, one of the shoes measured twelve inches and the other measured twelve and one-eighth inches. Officer Anton relayed to the jury that when he had Mark try on the size eleven and the size eleven-and-a-half shoes, Mark complained of the former not "fitting properly" but that the latter fit "rather well." Two podiatrists also testified at trial, both concluding that Mark had the same unusual, if not unique, combination of gait characteristics as those exhibited by the shoe prints found at the crime scene. The actual shoes worn by the murderer were never recovered.

Mark claimed that the State suppressed police reports indicating the shoe prints found at the crime scene "showed slight deformity to outside rear edge of both heels" and a report indicating that a pair of shoes fitting Mark properly had a sole longer than the crime scene prints. The Iowa Court of Appeals held that this evidence was not suppressed because both were "known and addressed at trial." *Id.* at 826. Mark also claimed that other reports were suppressed that indicated several models of tennis shoes could have matched the crime scene prints. The Iowa Court of Appeals held that these reports "would not have had an impact on the outcome of the trial" because it "did not demonstrate Mark was incapable of making the prints, rather only establish several sizes and brands of shoes could have made the prints." *Id.*

Fifth, Mark claimed that the State suppressed material evidence that .38-caliber Winchester Western Long Colt bullets, like the ones used in the murders, were available for sale in northeast Iowa. At trial, the State had argued that this type of bullet was not readily available in Iowa and that Mark had purchased this rare type of bullet in California. Mark claimed that an undisclosed police report revealed that a partial box of .38-caliber Winchester Western Long Colt ammunition was obtained by police from Olson's Boathouse in Waterloo, Iowa, within a week of the crime. Although Mark admitted he knew about the box, he claimed he was not informed that there were thirteen bullets missing from the box of fifty. The Iowa Court of Appeals held that this evidence was known by Mark, not exculpatory because sixteen, not thirteen, bullets were found at the crime scene, and did not create a reasonable probability that it "would have influenced the verdict." *Id.*

The sixth and final category of evidence Mark claimed was suppressed in violation of *Brady* concerned seven other witnesses. The first witness, Donald Shearer, testified in his deposition and at Mark's criminal trial that he saw Mark at a Stuckey's roadside store in Brady, Nebraska, around noon on Friday, October 31. Shearer's testimony was consistent with the prosecution's theory of the route traveled by Mark on his way to the murder scene. Also, both in his deposition and at trial,

Shearer referred to a man named Larry Holmes, who was also at Stuckey's and who attended to Mark on that day. Mark argued that the State wrongfully suppressed the report summarizing its interview with Holmes. The report stated that Holmes "did not personally remember seeing anything or viewing anyone who appeared to him to be out of the ordinary." With respect to this claim, the Iowa Court of Appeals held that "[t]he defense learned of Holmes' identity during Shearer's pretrial deposition. Mark also has not shown a reasonable probability the omissions in Shearer's initial statements to police would have affected the outcome of the trial." *Id.* at 825.

Mark next asserted that undisclosed police reports would have enabled him to discredit the testimony of Karelyn Kemp and Mary Stinson, two employees at the Shamrock Café in Atlantic, Iowa, who testified they saw Mark in the café around 6:00 p.m. on October 31. Another undisclosed report revealed Stinson, contrary to her trial testimony, told police she saw Mark in the café between 7:00 and 8:00 p.m. The reports also referred to a trucker, James Prosser, who was present in the café at the same time and denied Mark was there. The Iowa Court of Appeals held that Mark knew or should have known of Prosser's existence because Stinson stated at her deposition that two truckers were in the café at the same time Mark was present and that "Mark has not shown the discrepancies in Stinson's initial identification would have changed the verdict." *Id.*

Barbara Ann Smith, the manager of a Stuckey's roadside store in Newton, Iowa, identified Mark in a lineup as being at her store on Friday, October 31 between 5:00 p.m. and 6:00 p.m. At trial, she testified that she saw him between 6:30 p.m. and 7:30 p.m. Mark argued that the State wrongfully suppressed a police report documenting the time frame Smith provided at the lineup and her statements that the man at the store had blond hair, as opposed to Mark's red hair. The report also contained a statement by Smith after her lineup identification that "the subject did not look the same now as when he did when he was in the Stuckey's Restaurant on October 31, 1975." The Iowa Court of Appeals held that "[t]he imprecision of Smith's

identification was revealed during her deposition and referred to at trial. Mark was aware Smith believed the motorcyclist had dishwater blond unkempt hair. Mark has failed to demonstrate the State suppressed this evidence or that the police report would have changed the verdict." *Id.*

The next witness at issue was Delbert Van Hauen, who testified at trial that he saw Mark at the Holiday service station in Ackley, Iowa, on Friday, October 31. Some of the details provided by Van Hauen were contrary to other eyewitnesses and were also contrary to the actual description of Mark's motorcycle and attire. The Iowa Court of Appeals held that this evidence was not suppressed because it was addressed in Van Hauen's deposition and at trial. *Id.* The court also concluded that it would not have "influenced the verdict." *Id.*

Jayathan Hurd identified Mark, both in a lineup and at trial, as having patronized his gas station in Williams, Iowa, between 3:30 a.m. and 5:00 a.m. on the morning of Saturday, November 1. Mark contended that the State withheld police reports that detailed inconsistencies in the identifications made by Hurd and also revealed the existence of other witnesses in the station who did not recall seeing Mark. For example, another employee informed police that Hurd told him he observed Mark between 2:30 a.m. and 4:30 a.m. Because Hurd had indicated at his deposition that other employees were present in the gas station's café at the time he saw Mark, the Iowa Court of Appeals held that this evidence was not suppressed because Mark "knew or should have known the[] essential facts" necessary to pursue the matter. *Id.*

Finally, Mark claimed that the State suppressed police reports revealing discrepancies in the identification made by Rosalie McGinnis, who testified at trial that she saw Mark at a Conoco gas station in Stuart, Iowa, between 7:00 a.m. and 8:00 a.m. on Saturday, November 1. In a disclosed report, it was revealed that McGinnis was not sure if the motorcyclist she saw paid for his groceries with cash or by credit card. The suppressed police reports indicated that McGinnis believed that the

motorcyclist she saw purchased groceries with a credit card and also stated that she believed her memory to be impaired by a brain tumor. The Iowa Court of Appeals held that "[t]hese discrepancies were addressed at trial," and that the suppressed reports were of "minimal" impeachment value and "therefore would not have influenced the verdict." *Id*. at 826.

After addressing each of Mark's *Brady* claims, the Iowa Court of Appeals concluded its decision with the following statement: "We affirm the [Black Hawk County] district court's denial of Mark's petition for postconviction relief in its entirety." *Id*. at 827. Mark sought discretionary review in the Iowa Supreme Court, which was denied.

In 1997, Mark filed a timely pro-se petition for writ of habeas corpus in the United States District Court for the Northern District of Iowa, raising the same *Brady* claims he presented to the Iowa Court of Appeals.[2] After having counsel appointed, Mark filed a discovery motion requesting testing for DNA profiling on the four cigarette butts found at the crime scene. Initially, the district court granted the motion and also granted Mark's motion to expand the record with the DNA-profile test results. However, after the testing was completed, the district court reversed its ruling and denied Mark's motion to expand the record with the DNA test results.

Thereafter, the district court granted Mark's petition, holding that the State's suppression of twenty-four pieces of evidence violated Mark's due process rights. Warden Ault appeals the district court's grant of Mark's petition for writ of habeas corpus, and Mark cross-appeals its denial of his motion to expand the record with the

---

[2]Mark also raised a claim that the State used unduly and impermissibly suggestive photos to obtain out-of-court identifications in violation of his due process rights. *See Simmons v. United States*, 390 U.S. 377 (1968). The district court denied Mark's petition for writ of habeas corpus on this basis, and Mark did not cross-appeal this ruling.

-11-

DNA results from the tests conducted on the four cigarette butts found at the crime scene. For the reasons discussed below, we affirm the district court's denial of Mark's motion to expand the record, but we reverse its grant of his petition for writ of habeas corpus.

## II. DISCUSSION

### A. Warden Ault's Appeal

We review the district court's grant of habeas relief de novo. *Colvin v. Taylor*, 324 F.3d 583, 586 (8th Cir. 2003). "When *de novo* review is compelled, no form of appellate deference is acceptable." *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991). "Thus, we will look anew at the record which was before the district court when it made its decision in this matter." *Colvin*, 324 F.3d at 586.

Like the district court, we review the state-court decision under the standards established by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). "Pursuant to [AEDPA], when a state prisoner files a petition for writ of habeas corpus in federal court we are directed to undertake only a limited and deferential review of underlying state court decisions." *Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007) (quotation omitted). As the Supreme Court has stated, "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 692 (2002). As such, an application for habeas corpus:

> shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. . . .

28 U.S.C. § 2254(d). Because the Iowa Supreme Court denied Mark review, we apply the AEDPA standard to the decision of the Iowa Court of Appeals because it is the "last reasoned decision" of the state courts. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Oxford v. Delo*, 59 F.3d 741, 745 (8th Cir. 1995).

Well-settled United States Supreme Court precedent teaches that due process is violated where the state suppresses evidence that is favorable to the accused and is material to the issue of guilt or punishment. *Brady*, 373 U.S. at 87. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* Finally, suppressed evidence is to be considered collectively to determine if it is material—in other words, if the "net effect of all such evidence" reaches "the point of 'reasonable probability.'" *Kyles v. Whitley*, 514 U.S. 419, 436-37 (1995).

The district court held that Mark is entitled to relief under § 2254(d)(1) because the decision of the Iowa Court of Appeals is "contrary to" and an "unreasonable application" of Supreme Court precedent, specifically *Brady* and its progeny, in that it failed to consider the allegedly suppressed evidence collectively in order to determine whether confidence in the outcome of the trial was thereby undermined. We address each provision of § 2254(d)(1) in turn, beginning with the "contrary to" analysis.

"[A] state-court decision is contrary to [Supreme Court] precedent if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"—in other words, if it "applies a rule that contradicts the governing law set forth in our cases." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (stating that a hypothetical state-court decision applying a "preponderance" burden instead of a "reasonable probability" burden for demonstrating prejudice in an ineffective-

-13-

assistance-of-counsel claim would be "contrary to" its precedent) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). The decision of the Iowa Court of Appeals did not contain a statement of law directly contrary to the Supreme Court's rule announced in *Kyles* that suppressed evidence be considered collectively to determine whether it is material. In the absence of such direct evidence that the Iowa Court of Appeals applied "a rule that contradicts the governing law set forth in [Supreme Court] cases," Mark argued that the Iowa Court of Appeals "did not cite *Kyles v. Whitley*, nor did it address Mark's *Brady* claims collectively." The district court agreed.

Mark is correct that the Iowa Court of Appeals did not cite *Kyles v. Whitley* nor did it expressly state the rule that suppressed evidence is to be considered collectively to determine if its net effect is material.[3] However, "[a]voiding the[] pitfalls [of the "contrary to" provision of § 2254(d)(1)] does not require citation of our cases—indeed, it does not even require *awareness* of our cases . . . ." *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (emphasis in *Early*); *see also Brown v. Luebbers*, 371 F.3d 458, 467 (8th Cir. 2004) (en banc) (holding that "the absence of reasoning is not a barrier to a denial of [habeas] relief"). Therefore, our focus is on Mark's claim that the Iowa Court of Appeals' decision is contrary to Supreme Court precedent because it failed to address his *Brady* claims collectively.

The decision of the Iowa Court of Appeals will be "contrary to" clearly established federal law if the controlling Supreme Court cases require a "different outcome" or a "particular result." *See Long v. Humphrey*, 184 F.3d 758, 760 (8th Cir. 1999); *see also McReynolds v. Kemna*, 208 F.3d 721, 723 (8th Cir. 2000) (citing *Long*); *Atley v. Ault* 191 F.3d 865, 871 (8th Cir. 1999) (citing *Long*). The result of the

---

[3]We note that the Iowa Court of Appeals did cite to the Iowa Supreme Court's decision in *State v. Romeo*, 542 N.W.2d 543, 551 (Iowa 1996), which in turn cited to *Kyles*.

Iowa Court of Appeals' decision was its holding that Mark's due process rights were not violated by the alleged suppression of exculpatory evidence. As we will demonstrate, the governing law set forth by Supreme Court precedent—namely, the rule that allegedly suppressed evidence be considered collectively in order to determine if its net effect is material—does not require a different outcome in this case.

Without indulging in a "federal habeas 'retrial,'" *Bell*, 535 U.S. at 692, we must review some of the additional facts that were presented to the jury in Mark's trial and contained in the record before the Iowa Court of Appeals in order to examine the net effect of the allegedly suppressed evidence. *See Kyles*, 514 U.S. at 441-54 (examining the evidence presented at trial in order to weigh the net effect of the suppressed evidence). For example, the record contained evidence of Mark's motive for the murders. Mark did not have an amicable relationship with his brother, Leslie, and they disagreed over the distribution of their father's estate. Once his brother took over the family farm, Mark was repeatedly heard saying that he "hated his little brother and would never forgive him for screwing him out of the farm." Additionally, nothing was stolen from the house, eliminating the motive of theft.

The jury also heard evidence that Mark had access to a murder weapon. Mark had obtained a .38-caliber Colt revolver from his girlfriend that used the same type of rare bullets used to commit the murders. Originally, Mark lied to the police and stated that he had never bought ammunition for this Colt revolver, but the jury heard testimony from the co-owner of a sporting goods store in California who produced records showing that Mark purchased a box of .38-caliber Winchester Western Long Colt bullets—the same type of bullets used in the murders—from his store just eleven days before the murders. On the same day he bought the bullets, Mark altered his appearance by shaving off his beard and mustache.

-15-

Evidence was presented that tended to show that the murderer was someone familiar with the victims and the premises. The investigators learned that the telephone wires which led to a neighboring farm had been cut on the night of the murders. Prior to 1974, that set of wires actually led to the Mark farm, but they were re-routed during the summer of 1974. Because Mark moved from Iowa, where he had been living and working during and after college, to California in 1974, he would have been familiar with the telephone wires only as they existed before they were re-routed. Near the location where the telephone wires had been cut, investigators found two of the rare .38-caliber Winchester Western Long Colt bullets. The investigators also found shoe prints near and around a small camper located on the farm. Because Mark had previously worked on the farm with his father and brother, he would have been aware of Leslie's tendency to sleep in the camper. Each victim was murdered in or near their own bed, indicating that the murderer was able to enter the house without rousing anyone or the family dog. The jury heard evidence that Mark knew that the key to the back door of the house hung from a nail on the back porch.

The jury also heard evidence that Mark lied to investigators regarding his route of travel. Originally, Mark stated that he left California on October 29 and traveled south to the Mojave Desert. He eventually admitted to traveling as far east as the panhandle of Nebraska, but he denied traveling farther than fifty miles east of Chappell, Nebraska, which was nearly 600 miles from the crime scene, despite the many witnesses who placed him as far as Ackley, Iowa, just thirty-six miles from the crime scene.

Finally, the jury was also presented with telephone records, revealing that a call was made from a telephone booth in Alda, Nebraska, between 3:00 p.m. and 4:00 p.m. on Saturday, November 1, to the residence of Mark's girlfriend and her family. When Mark's girlfriend's mother answered the phone, she heard Mark's voice. She then asked him, "Jerry, where are you?" to which he replied, "I can't say." All of this

evidence, along with the evidence we previously recounted, was presented at trial and contained in the record before the Iowa Court of Appeals.

Although the Iowa Court of Appeals held that some of the disputed evidence was not suppressed because Mark "knew or should have known" of its existence, we assume for our purposes that all of the disputed evidence was wrongfully suppressed. In order to weigh the net effect of the suppression of this evidence, we must consider its exculpatory value. We believe that some of the evidence was of very little, if any, value to Mark. For example, Jean Doyle originally identified a man in a photograph presented to her by investigators as having been at the truck stop in North Platte at noon on Saturday, November 1. As previously explained, this statement was, to some extent, exculpatory because it appeared to provide an alibi for Mark. However, investigators subsequently realized that they accidentally had shown Doyle a picture of Leslie Mark, Mark's brother, that was approximately ten years old. When they re-interviewed Doyle and presented her with a current picture of Mark, Doyle stated "positively" that this was not the man she observed at the truck stop. In light of Doyle's second statement, this evidence is hardly exculpatory. Likewise, the evidence that investigators had obtained a fifty-count box of Winchester Western Long Colt bullets from Olson's Boathouse in Waterloo, Iowa, of which thirteen had been sold one week prior to the murder, was not exculpatory. Because sixteen, not thirteen, bullets were recovered from the crime scene, Mark's trial counsel conceded during Mark's state postconviction proceedings that this evidence was not exculpatory.

However, even assuming that all of disputed evidence was to some degree exculpatory, in light of the strong circumstantial evidence connecting Mark to the murders, the "net effect of" the minimally exculpatory evidence cannot "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See id*. at 435-37. Accordingly, it is not contrary to Supreme Court precedent to conclude that the allegedly suppressed evidence, when considered collectively, does not create "a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different," and that therefore it is not material. *Kyles*, 514 U.S. at 433. Under Supreme Court precedent, the result of this conclusion is that Mark's due process rights were not violated. *See id.* This is the same result reached by the Iowa Court of Appeals. Accordingly, we cannot say that Supreme Court precedent requires a result "contrary to" that reached by the Iowa Court of Appeals. *See Nelson v. Hvass*, 392 F.3d 320, 322 (8th Cir. 2004) ("[W]e may grant habeas relief only if the state court's resolution of the claim cannot reasonably be justified under existing Supreme Court precedent."). Therefore, we hold that Mark is not entitled to relief under the "contrary to" provision found in § 2254(d)(1).

Turning to the "unreasonable application" provision of § 2254(d)(1), relief is warranted only where the state court decision "'identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Collier*, 485 F.3d at 421 (quoting *Williams*, 529 U.S. at 413). It is not enough for the federal habeas court to conclude that, in its independent judgment, it would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable. *Id.* (citing *Williams*, 529 U.S. at 411). In other words, "[a] federal court may not overrule a state court for simply holding a view different from its own." *Mitchell v. Esparza,* 540 U.S. 12, 17 (2003) (per curiam).

Mark did not present an argument on appeal concerning the unreasonable application provision. Ordinarily, this "failure to raise or discuss an issue in his brief [would] be deemed an abandonment of that issue." *Hacker v. Barnhart*, 459 F.3d 934, 937 n.2 (8th Cir. 2006). However, even assuming Mark had properly presented this claim, in light of the evidence set out above and our conclusion that the allegedly suppressed evidence, when considered collectively, does not require the conclusion that Mark's due process rights were violated, we would not find the decision of the Iowa Court of Appeals to be "objectively unreasonable." *See Collier*, 485 F.3d at 421.

We hold that Mark is not entitled to relief under the "unreasonable application" provision of § 2254(d)(1).

The Supreme Court has instructed us to give decisions of state courts "the benefit of the doubt." *Woodford v. Visciotti,* 537 U.S. 19, 24 (2002) (per curiam). The Court has cautioned us that "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law." *Id*. With these principles in mind, and granting substantial deference to the Iowa Court of Appeals as mandated by AEDPA, we conclude that, despite its failure to cite *Kyles v. Whitely* directly, its decision denying Mark relief is not "contrary to" nor an "unreasonable application" of clearly established federal law as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d)(1). Accordingly, we reject Mark's claim for writ of habeas corpus and reverse the district court's grant of his petition.[4]

---

[4]The district court considered many other issues in its order. For example, it addressed: (1) "the trial judge's failure to correctly apply '*Brady* law' that defendant have the right to see and consider prior to trial all exculpatory evidence at the earliest opportunity"; (2) the issue that "none of the conclusions by the Iowa courts that denied any *Brady* violations because of the 'knew or should have known' doctrine was in accordance with prevailing law"; (3) the issue that "neither the trial judge nor the post-conviction relief judge followed the mandate of . . . *State v. Peterson* (citing *Brady*), 219 N.W.2d 665 (Iowa 1974)"; and (4) the issue that the trial court's in-camera inspection of the State's file to determine what evidence was to be disclosed to Mark under *Brady* did not "comply with federal law." *Mark v. Burger*, No. 97-4059, 2006 WL 2556577, at *12, 22, 77 (N.D. Iowa Aug. 31, 2006). These issues were not raised by Mark below and are not urged upon us as grounds for affirmance on appeal. *Hacker*, 459 F.3d at 937 n.2 ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue."). Therefore, we need not address these claims in detail. Suffice it to say that we find the additional issues raised by the district court to be without merit. *See e.g., Kyles*, 514 U.S. at 436 (rejecting the notion that *Brady* requires disclosure all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense); *see id*. (addressing only evidence "*unknown* to the defense" as a basis for a potential *Brady* violation) (emphasis added); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)

-19-

## B.    Mark's Cross-Appeal

Mark cross-appeals the district court's denial of his motion to expand the record with the DNA-profile results collected from testing of four cigarette butts found at the crime scene.  Warden Ault resisted the motion, arguing that Mark was asserting a claim based on newly discovered evidence, a claim that must first be exhausted in state court.  After originally granting Mark's motion, the district court reversed its ruling, stating that it did not want "the appellate process . . . complicated by the reviewing court concluding that there is an exhaustion problem."  We affirm the district court's denial of Mark's motion.

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1).  While Mark does not contest the fact that he did not present the new DNA evidence to the state courts, he argues that there is no exhaustion issue because this evidence does not support a new claim but rather is offered as relevant evidence to bolster his *Brady* claim.  In other words, he argues that the new DNA evidence is relevant "to show that Mark was prejudice [sic] by the state's suppression of exculpatory evidence relating to pretrial blood-type testing of the cigarette butts."  Alhough we are inclined to view this argument as an attempt to inappropriately boot-strap the new evidence to Mark's properly exhausted claim, for the purposes of this appeal we will assume without deciding that the new evidence serves only to bolster

("[F]ederal habeas corpus relief does not lie for errors of state law . . . [and] it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *United States v. Boykin*, 986 F.2d 270, 276 n.2 (8th Cir. 1993) ("We note that it is common practice for the court to view in camera information which the prosecutor possesses to determine whether it is *Brady* material which must be disclosed . . . .").

Mark's claim of constitutional error under *Brady* and does not present a new, unexhausted claim.

Mark's motion to expand the record is governed by Rule 7 of the Rules Governing Habeas Corpus Cases under Section 2254, which provides that "[i]f the petition is not dismissed, the judge may direct the parties to expand the record by submitting additional materials relating to the petition." *See also Brown v. Johnson*, 224 F.3d 461, 468-69 (5th Cir. 2000). When a petitioner seeks to introduce evidence pursuant to this rule, the conditions prescribed by § 2254(e)(2) must still be met. *See Holland v. Jackson*, 542 U.S. 649, 652-53 (2004) (per curiam); *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1241 (9th Cir. 2005) (stating that a petitioner "must comply with § 2254(e)(2) in order to expand the record under Rule 7"); *Boyko v. Parke*, 259 F.3d 781, 790 (7th Cir. 2001) ("When expansion of the record is used to achieve the same end as an evidentiary hearing, the petitioner ought to be subject to the same constraints that would be imposed if he had sought an evidentiary hearing."). A district court's decision regarding whether to expand the record under Rule 7 is reviewed for an abuse of discretion. *See, e.g., Hoi Man Yung v. Walker*, 468 F.3d 169, 177 (2d Cir. 2006); *Apanovitch v. Houk*, 466 F.3d 460, 478-79 (6th Cir. 2006); *Eckstein v. Kingston*, 460 F.3d 844, 852 (7th Cir. 2006); *Landrigan v. Stewart*, 272 F. 3d 1221, 1229 n.7 (9th Cir. 2001).

Under 28 U.S.C. § 2254(e)(2), "[a] habeas petitioner must develop the factual basis of his claim in the state court proceedings rather than in a federal evidentiary hearing unless he shows that his claim relies upon a new, retroactive law, or due diligence could not have previously discovered the facts." *Cox v. Burger*, 398 F.3d 1025, 1030 (8th Cir. 2005) (citing 28 U.S.C. § 2254(e)(2)). It is undisputed that the DNA testing yielding the results now at issue was not available at the time of Mark's state court proceedings and therefore could not have been discovered previously by due diligence.

Additionally, under § 2254(e)(2) "a petitioner must show that the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Perry v. Kemna*, 356 F.3d 880, 889 (8th Cir. 2004) (internal quotation omitted). Again, assuming without deciding that the "constitutional error" is that alleged in Mark's exhausted *Brady* claim, we hold that Mark has failed to show that the new DNA evidence clearly and convincingly establishes that no reasonable factfinder would have found him guilty.

Four cigarette butts were found at the crime scene, tested for blood type and discussed at Mark's criminal trial. The first, designated "AJ," was discovered on the floor of Julie Mark's upstairs bedroom. The second butt, designated "CO," was discovered in an unused upstairs bedroom. The third and fourth butts were discovered in the basement near an electrical box, designated "DM-1" and "DM-2." At trial, the State presented evidence that all four cigarette butts were smoked by a person with "type-O secretor blood," the same type of blood as Mark. Mark cross-examined the State's expert witness, establishing the error rate of the blood-type testing and establishing that Mark's blood type was common among the general population. Also on cross-examination, Mark established that the "CO" cigarette butt contained "type-A secretor blood" traces and was actually smoked by Deputy Weiser, who was a state investigator present at the crime scene. Presumably because of the damaging cross-examination of its expert witness, the State did not once mention the blood-type test results from the cigarette butts to the jury in either its closing or rebuttal arguments.

During his state PCR proceedings, Mark initiated DNA testing on the four cigarette butts. No results were yielded, however, due to an insufficient sample size. In the federal habeas proceedings, and with the advent of "short tandem repeat" DNA testing which requires a smaller sample size, Mark initiated further testing of the four cigarette butts. The results, the accuracy of which is not disputed by Warden Ault, revealed the following: (1) the DNA profile obtained from the "CO" cigarette butt

eliminated Mark's profile; (2) the DNA profile obtained from the "DM-2" cigarette butt eliminated Mark's and Deputy Weiser's profiles; and (3) there was still an insufficient sample size to create a DNA profile with respect to "AJ" and "DM-1."

Mark utterly failed to explain in his briefing to this court how this new evidence clearly and convincingly demonstrates that, if presented with it, no reasonable factfinder would have found him guilty, and we are unable to reach such a conclusion. Regarding samples "AJ" and "DM-1," the testing yielded no results and therefore establishes nothing. With respect to the "CO" sample, we already noted that it was established at trial that Deputy Weiser smoked this cigarette. Therefore, the results from the "CO" sample simply confirm what was already known at trial and cannot establish that no reasonable factfinder would have found Mark guilty had it been presented. Finally, the new test results from the "DM-2" sample eliminate Mark's DNA profile, whereas at trial the jury was led to believe that Mark could have smoked this cigarette since his blood type was the same as the type found on it. Although the jury heard testimony that Mark's blood type matched that found on the "DM-2" sample, the impact of this evidence was somewhat neutralized by Mark establishing on cross-examination that his blood type was very common among the general population and the expert's admission that blood-type testing is subject to error. Furthermore, the jury also heard testimony that of the many people on the investigation team who were present at the crime scene, several of them were smokers and smoked while at the crime scene. Finally, the fact that the State did not once mention the cigarette butt evidence to the jury in its closing and rebuttal arguments serves to illustrate the minimal impact of this evidence on the outcome of the trial.

In sum, the majority of the new DNA evidence with which Mark seeks to expand the record only confirms what the jury could have reasonably concluded from the evidence presented to them at trial. With respect to the results from the "DM-2" sample indicating that Mark did not smoke that particular cigarette, we conclude that its probative value is slight when compared to the overall evidence implicating Mark.

As such, the new DNA evidence Mark presents is not clear and convincing evidence in the face of which no reasonable factfinder would have found Mark guilty. Therefore, the district court did not abuse its discretion in denying Mark's motion to expand the record because Mark has failed to satisfy the clear and convincing evidence standard under § 2254(e)(2) that must be met in order to comply with Rule 7. *See Holland*, 542 U.S. at 652-53.

## III.    CONCLUSION

For the foregoing reasons, we reverse the district court's grant of Mark's petition for writ of habeas corpus and affirm its denial of his motion to expand the record.  On remand, we instruct the district court to enter an order denying Mark's petition with prejudice.

_____